[No. 27455-8-II. Division Two. April 29, 2003.]

THE STATE OF WASHINGTON, *Respondent*, v. CHRISTOPHER DORIAN MADDOX, *Appellant*.

*Steven W. Thayer*, for appellant.

*Arthur D. Curtis*, *Prosecuting Attorney*, and *Leann S. Larson*, *Deputy*, for respondent.

MORGAN, J. — Christopher Dorian Maddox was convicted of two counts of possessing a controlled substance with intent to deliver. He contends on appeal that the police unlawfully searched his home. We affirm.

On or before September 15, 2000, an informant told the police that he had purchased methamphetamine from Maddox at least 35 times in the past four years, typically in

"quantities up to four ounces[.]"[1] The record does not show whether those purchases occurred at Maddox's home.

On September 15, the informant arranged a controlled buy at Maddox's house. The informant was searched by officers, furnished with cash, and watched until he entered the house. He emerged a few minutes later with methamphetamine. He related that he had bought the methamphetamine from Maddox and that Maddox had said he might be able to buy more if he "would bring back 'cash.' "[2]

On September 18, 2000, Detective Mary Parsons applied for a warrant to search Maddox's house. She described the September 15 controlled buy and related that the informant had successfully made two other controlled buys. She stated that public or law enforcement records showed that Maddox owned the house in question, that Maddox was the registered owner of a car parked in the driveway of the house, and that Maddox had a 1998 felony drug conviction. She related that the informant could identify methamphetamine, that the informant was "working with law enforcement in exchange for a favorable recommendation on pending felony drug charges[,]"[3] and that the informant was wanted on a DUI (driving under the influence) warrant that was being held in abeyance at police request.

On September 18, 2000, at 4:06 P.M., the search warrant was issued by a magistrate. It authorized a search of the house for methamphetamine; paraphernalia used for packaging, weighing, and distributing methamphetamine; and

---

[1] Ex. 2, at 3.

[2] Ex. 2, at 4.

[3] Ex. 2, at 5.

currency, books, and records.[4] In accordance with CrR 2.3(c), it required that the search occur "within 10 days[.]"[5]

---

[4] The warrant authorized a search of Maddox's house for the following items:

(1) METHAMPHETAMINE, a substance controlled by the Uniform Controlled Substances Act of the State of Washington, and items used to facilitate the distribution and packaging of METHAMPHETAMINE;

(2) Records relating to the transportation, ordering, manufacturing, possession, sale, transfer and/or importation of controlled substances in particular, METHAMPHETAMINE, including but not limited to books, notebooks, ledgers, check book ledgers, handwritten notes, journals, calendars, receipts, and the like;

(3) Records showing the identity of co-conspirators in this distribution operation, including but not limited to address and/or phone books, telephone bills, notebooks, ledgers, check book ledgers, handwritten notes, journals, calendars, receipts, and the like;

(4) Records which will indicate profits and/or proceeds of the illegal distribution operation of METHAMPHETAMINE, to include, but not limited to books, notebooks, ledgers, check book ledgers, handwritten notes, journals, calendars, receipts, and the like;

(5) Books, records, invoices, receipts, records of real estate transactions, purchase, lease or rental agreements, utility and telephone bills, records reflecting ownership of motor vehicles, keys to vehicles, bank statements and related records, pay stubs, tax statements, cashiers checks, bank checks, safe deposit box keys, and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money and/or dominion and control over assets and proceeds;

(6) Photographs, including still photos, negatives, video tapes, films, undeveloped film and the contents therein, and slides, in particular, photographs of co-conspirators, of assets, and controlled substances, in particular METHAMPHETAMINE;

(7) Currency, and financial instruments, including stocks and bonds for the purpose of tracking proceeds and/or profits;

(8) Address and/or telephone books, telephone bills, and papers reflecting names, addresses, telephone numbers, pager numbers, of sources of supply, customers, financial institution, and other individuals or businesses with whom a financial relationship exists;

(9) Correspondence, papers, records, and any other items showing employment or lack of employment of defendant(s) or reflecting income or expenses, including but not limited to items listed in paragraph 5, financial statements, credit card records, receipts, and income tax returns;

(10) Paraphernalia for packaging, weighing and distributing METHAMPHETAMINE, including but not limited to scales, baggies, and other items used in the distribution operation, including firearms;

(11) Photographs of the crime scene and to develop any photographs taken of the crime scene, including still photos and videocassette recordings and to develop any undeveloped film located at the residence.

Ex. 1, at 2-3.

[5] Ex. 1, at 1.

The police did not serve the search warrant immediately. Instead, they had the informant conduct two more controlled buys at Maddox's house.

The first postwarrant buy took place on September 21, 2000. The informant was again searched by officers to ensure he did not have drugs on his person. He was given $600, told to buy half an ounce of methamphetamine, and watched until he entered Maddox's house. He emerged a few minutes later with a full ounce of methamphetamine. He explained that Maddox had prepackaged his methamphetamine in full-ounce packets and would not sell part of a packet. Maddox had "fronted" the additional half ounce for which the informant had not had money, so the informant now owed Maddox a "debt."[6]

The second postwarrant buy occurred on September 27, 2000. Once again, the informant was searched to ensure he did not have drugs on his person. He was instructed "to buy more [m]ethamphetamine if he could[,]" and also "to pay the 'debt' from . . . September 21, 2000."[7] He was furnished with $1,000 in identifiable bills and watched until he entered Maddox's house. He emerged a few minutes later without methamphetamine and with only $280 in cash. He said that he had used $720 to pay "debts" he owed to Maddox, and that Maddox had claimed to be "out of [m]ethamphetamine" for "a couple days."[8]

On September 28, 2000, at 2:45 P.M., the police served the warrant they had been holding since September 18. They found and seized 881.6 grams of marijuana and 45 ecstasy pills, but no methamphetamine. They found and seized an electronic scale, $2,100 in cash (including the $720 furnished to the informant on September 27), and "misc[ella-neous] papers."[9] The "papers" were not offered in the trial

---

[6] Clerk's Papers (CP) at 70-71; Finding of Fact (FOF) 5.

[7] CP at 71; FOF 6.

[8] CP at 71; FOF 8.

[9] CP at 18.

court and are not included (or even described) in the record on appeal.

On November 16, 2000, the State charged Maddox with two counts of delivery of methamphetamine (Counts I and II), possession with intent to deliver marijuana (Count III), and possession with intent to deliver ecstasy (Count IV).[10] Later, the State added a school zone enhancement to each count.

In March 2001, Maddox moved to sever Counts I and II from Counts III and IV. The motion was granted, and Counts I and II were tried to a jury later that month. The jury acquitted on both.

Meanwhile, Maddox moved to suppress the marijuana underlying Count III and the ecstasy underlying Count IV. He also waived a jury on Counts III and IV. In June 2001, the trial court denied his motion to suppress, convened a bench trial on stipulated facts, and convicted him on Counts III and IV. He now appeals those convictions, contending that the search of his home was unlawful.

# I

Maddox claims that the warrant was not lawfully issued on September 18. This is true, he says, because (A) there was no probable cause to believe that methamphetamine would be found in his home; (B) there was no probable cause to believe that evidence of methamphetamine dealing would be found in his home; and (C) the warrant purported to authorize a search for books and records not related to methamphetamine dealing, and thus was "overbroad."

## A

As just indicated, Maddox claims that there was no probable cause to believe methamphetamine would be found in his home. To determine whether there was prob-

---

[10] According to the charge filed herein, "ecstasy" is chemically known as "3, 4-Methylendioxymethamphetamine." CP at 2, 64.

able cause, we must examine whether the facts presented to the magistrate were sufficient to support a reasonable inference that methamphetamine would probably be found in Maddox's home.[11]

■ According to Parsons' affidavit, the informant claimed to have bought methamphetamine from Maddox, in amounts up to four ounces, on at least 35 prior occasions over the past four years.[12] On September 15, the informant claimed to have bought methamphetamine from Maddox in Maddox's house, and to have been told Maddox might have more if the informant returned with cash. The informant had a "track record" sufficient to support an inference of veracity because he had previously conducted two successful controlled buys.[13] The police corroborated the September 15 transaction by searching the informant before he went into the house, watching him as he entered and returned, and searching him afterward. The police corroborated other facts through public or law enforcement records (i.e., that Maddox owned the house and the car parked in the driveway, and that Maddox had a prior felony conviction for drugs). Given both the informant's "track record"[14] and independent corroboration by the police, the magistrate had discretion to credit the informant's assertions; to find that Maddox probably had methamphetamine in his house; and to issue a warrant for the house on September 18.

---

[11] *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999); *State v. Perez*, 92 Wn. App. 1, 4, 963 P.2d 881 (1998), *review denied*, 137 Wn.2d 1035 (1999).

[12] Maddox points out that the affidavit for the warrant fails to link these 35 occasions to his residence. That is true. It is also immaterial, as the controlled buy of September 18 amply supplied a nexus between contraband and Maddox's residence.

[13] *See State v. Fisher*, 96 Wn.2d 962, 965-66, 639 P.2d 743, *cert. denied*, 457 U.S. 1137 (1982); *State v. Lane*, 56 Wn. App. 286, 293, 786 P.2d 277 (1989).

[14] *See, e.g., State v. Jackson*, 102 Wn.2d 432, 437, 688 P.2d 136 (1984); *State v. Woodall*, 100 Wn.2d 74, 76-77, 666 P.2d 364 (1983).

B

■ Relying on *State v. Thein*,[15] Maddox claims that Parsons' affidavit "does not establish probable cause to believe that any evidence of methamphetamine dealing would be found inside [his] residence."[16] We disagree. Parsons' affidavit showed (1) that the informant had bought methamphetamine from Maddox many times over the past four years, and (2) that on September 15, just three days earlier, the informant had bought methamphetamine from Maddox at Maddox's house. If the magistrate chose to believe those facts, as he obviously did, he could reasonably infer that Maddox was currently dealing methamphetamine out of his home; and if the magistrate could infer that much, he could also infer that Maddox had evidence of such dealing in his home.

■ Maddox's reliance on *Thein* is misplaced. The question in *Thein* was whether a magistrate could reasonably infer, from the fact that a person was dealing drugs from a location *other than* his or her home, the additional fact that the person probably had drugs or evidence of drug dealing in his or her home.[17] The question here is whether a magistrate can reasonably infer, from the fact that a person is dealing drugs *from* his or her home, the additional fact that the person probably has drugs or evidence of drug dealing *in* his or her home. The answer to the first question is no, but the answer to the second question is yes. When the magistrate issued the warrant on September 18, there was probable cause to believe Maddox had evidence of methamphetamine dealing in his home.

---

[15] 138 Wn.2d 133, 977 P.2d 582 (1999).

[16] Br. of Appellant at 11.

[17] 138 Wn.2d at 136.

## C

Maddox claims that the search warrant for his home was overbroad and thus "invalid[] in its entirety."[18] The State argues that the warrant was not overbroad or, if the warrant was overbroad, that "the severability doctrine" operates to save its valid parts.[19] We address overbreadth first and severability second.

### 1

A warrant can be "overbroad" either because it fails to describe with particularity items for which probable cause exists,[20] or because it describes, particularly or otherwise, items for which probable cause does not exist.[21] Regardless of which reason is claimed, the warrant must be read "in a commonsense, practical manner, rather than in a hypertechnical sense[,]"[22] "keeping in mind the circumstances of the case[.]"[23]

---

[18] Br. of Appellant at 15.

[19] Br. of Resp't at 14.

[20] *See United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986); *State v. Stenson*, 132 Wn.2d 668, 692-93, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998); *State v. Perrone*, 119 Wn.2d 538, 545-46, 834 P.2d 611 (1992).

[21] *Perrone*, 119 Wn.2d at 558 ("[s]ome items described are without probable cause and no degree of particularity will save them"). Thus, a warrant may not describe items that are not shown to be contraband or evidence of crime. *See, e.g., State v. Riley*, 121 Wn.2d 22, 27-28, 846 P.2d 1365 (1993) (documents supporting warrant did not show that items to be seized were evidence of a crime); *Perrone*, 119 Wn.2d at 548 (" 'It must be probable . . . that the described items are connected with criminal activity' " (quoting 2 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 4.6(a), at 236 (2d ed. 1987))); *State v. Goble*, 88 Wn. App. 503, 509, 945 P.2d 263 (1997) ("probable cause requires a nexus between criminal activity and the item to be seized").

[22] *Perrone*, 119 Wn.2d at 549; *see also Stenson*, 132 Wn.2d at 693.

[23] *Stenson*, 132 Wn.2d at 693. Similarly, the warrant must be read as a whole and in context. *See Andresen v. Maryland*, 427 U.S. 463, 480, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976) ("[w]e think it clear from the context"); *United States v. Conley*, 4 F.3d 1200, 1208 (3d Cir. 1993) (warrant must be read in context, not in isolation, and as a whole), *cert. denied*, 510 U.S. 1177 (1994); *United States v. Beaumont*, 972 F.2d 553, 560 (5th Cir. 1992) (warrant must be read as a whole), *cert. denied*, 507 U.S. 1054 (1993); *United States v. Sullivan*, 919 F.2d 1403, 1423 (10th Cir.

The warrant in this case authorized the police to search for a number of items that were supported by probable cause and described with particularity. Such items included methamphetamine; paraphernalia used for weighing, packaging, and distributing methamphetamine (including scales and baggies); and records indicating methamphetamine distribution and its profits (including books, notebooks, ledgers, checkbook ledgers, handwritten notes, journals, calendars, and receipts related to methamphetamine distribution).[24] At the same time, however, the warrant authorized the police to search for many items for which there was no probable cause whatever: books and records showing "the identity of co-conspirators"; photographs of co-conspirators, assets, and drugs; and other books and records not associated with methamphetamine distribution.[25] Accordingly, we hold that the warrant was overbroad.

## 2

Under the severability doctrine, " 'infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant' but does not require suppression of anything seized pursuant to valid parts of the warrant."[26] Thus, the doctrine applies when a warrant includes not only items that are supported by probable cause and described with particularity, but also items that are not supported by probable cause or not described with particularity, so long as a "meaningful separation" can be

---

1990) (warrant must be read in practical sense and as a whole), *cert. denied*, 506 U.S. 1066 (1993); *Perrone*, 119 Wn.2d at 552-53 ("term 'child . . . pornography' . . . is invalid in the context of the warrant's language as a whole").

[24] *See supra* note 4, paragraphs (1), (2), (4), (7) and (10) of the warrant.

[25] *See supra* note 4, paragraphs (5), (6), (8) and (9) of the warrant. These paragraphs were not limited to items associated with methamphetamine.

[26] *Perrone*, 119 Wn.2d at 556 (quoting *United States v. Fitzgerald*, 724 F.2d 633, 637 (8th Cir. 1983), *cert. denied*, 466 U.S. 950 (1984)).

made on "some logical and reasonable basis[.]"[27] As the Washington Supreme Court has noted, " '[i]t would be harsh medicine indeed if a warrant which was issued on probable cause and which did particularly describe certain items were to be invalidated in toto merely because the affiant and magistrate erred in seeking and permitting a search for other items as well.' "[28]

Reasoning from these generalities, we think that the severability doctrine applies only when at least five requirements are met. First, the warrant must lawfully have authorized entry into the premises. The problem must lie in "the permissible intensity and duration of the search[,]"[29] and not in the "intrusion per se."[30]

Second, the warrant must include one or more particularly described items for which there is probable cause. Otherwise, there is nothing for the severability doctrine to save.

Third, the part of the warrant that includes particularly described items supported by probable cause must be significant when compared to the warrant as a whole. If most of the warrant purports to authorize a search for items not supported by probable cause or not described with particularity, the warrant is likely to be "general" in the sense of authorizing " 'a general, exploratory rummaging in

---

[27] *Perrone*, 119 Wn.2d at 560. Conversely, the severability doctrine does not apply when it would be " 'a means for defeating the particularity requirement' " or "utterly inconsistent with the protections afforded by the Fourth Amendment." *Perrone*, 119 Wn.2d at 558-59 (quoting *State v. Noll*, 116 Wis. 2d 443, 456, 343 N.W.2d 391, *cert. denied*, 469 U.S. 837 (1984)).

[28] *Perrone*, 119 Wn.2d at 556 (quoting 2 LaFave, *supra* note 21, § 4.6(f), at 258 n.106).

[29] 2 Wayne R. LaFave, Search and Seizure § 4.6(f), at 582 (3d ed. 1996); *see also* § 4.10(d), at 670.

[30] *See Andresen*, 427 U.S. at 479.

a person's belongings[,]' "[31] and no part of it will be saved by severance or redaction.[32]

Fourth, the searching officers must have found and seized the disputed items while executing the valid part of the warrant (i.e., while searching for items supported by probable cause and described with particularity). Just as evidence found while executing a wholly invalid warrant would not be saved,[33] and just as evidence found while exceeding the scope of a wholly valid warrant would not be saved,[34] evidence found while executing the unlawful part of a partially valid warrant should not be saved either. As a commentator correctly summarizes:

> If the items [that the defendant now seeks to suppress] were discovered before those to which the warrant was properly addressed were found and while the police were looking in places where the latter objects could be located, then it may be said that the discovery occurred while executing the lawful portion of the warrant. Were the circumstances otherwise, then it must be concluded that these other items were found during execution of the invalid part of the warrant.[35]

Fifth, the officers must not have conducted a general search, i.e., a search in which they "flagrantly disregarded" the warrant's scope.[36] Just as such a search taints all parts

---

[31] *See Andresen*, 427 U.S. at 480 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)).

[32] *Perrone*, 119 Wn.2d at 556-57 ("Where a search warrant is found to be an unconstitutional general warrant, the invalidity due to unlimited language . . . taints all items seized without regard to whether they were specifically named in the warrant."); *United States v. Cardwell*, 680 F.2d 75, 77-78 (9th Cir. 1982).

[33] *State v. Schlieker*, 115 Wn. App. 264, 272, 62 P.3d 520 (2003); *State v. Magneson*, 107 Wn. App. 221, 226-27, 26 P.3d 986, *review denied*, 145 Wn.2d 1013 (2001).

[34] *United States v. Crozier*, 777 F.2d 1376, 1381 (9th Cir. 1985) ("[o]nly those items which fall outside the scope of the warrant need be suppressed"). We are assuming, of course, no justification independent of the warrant (e.g., plain view).

[35] 2 LaFave, *supra* note 29, § 4.6(f), at 582.

[36] *See United States v. Foster*, 100 F.3d 846, 849 (10th Cir. 1996); *United States v. Medlin*, 842 F.2d 1194, 1199 (10th Cir. 1988) ("[w]hen law enforcement officers grossly exceed the scope of a search warrant in seizing property, . . . a valid

of a warrant that was completely valid at the time of its issuance,[37] it taints, a fortiori, all parts of a warrant that was only partially valid at the time of its issuance.

In *State v. Perrone*,[38] on which Maddox heavily relies, the warrant met few of these five requirements. It purported to authorize a search for adult pornography that was not supported by probable cause, and for child pornography that was not described with particularity. Its lawful part was small when compared to its whole. Its lawful and unlawful parts were so inextricably intertwined that there was no way to tell which part the police were executing at the time they found and seized any given item. The police seem to have conducted a general search, for they seized many items not related to any crime.[39]

In the present case, by way of contrast, the warrant meets all five requirements. It was valid to the extent it authorized a search for drugs, evidence of drug dealing, and books and records related to drug dealing. Although it was invalid to the extent it included books and records not related to crime, the defect went to "the permissible intensity and duration of the search"[40] as opposed to the "intrusion per se[.]"[41] Its grant of authority to search for methamphetamine, paraphernalia related to methamphetamine dealing, and books and records related to methamphetamine dealing was significant when compared to its whole,

_____

warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant"); *Marvin v. United States*, 732 F.2d 669, 674-75 (8th Cir. 1984); *Crozier*, 777 F.2d at 1381; *United States v. Heldt*, 668 F.2d 1238, 1259 (D.C. Cir. 1981), *cert. denied sub nom. Hubbard v. United States*, 456 U.S. 926 (1982); *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978); 68 AM. JUR. 2D *Searches and Seizures* § 295, at 847 (2000). *Cf. Waller v. Georgia*, 467 U.S. 39, 43 n.3, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) (where officers did not exceed "the scope of the warrant in the places searched[,]" but only "took away items unconnected to the prosecution[,]" there is "certainly no requirement that lawfully seized evidence be suppressed").

[37] *See Foster*, 100 F.3d at 849-51; *Medlin*, 842 F.2d at 1199.

[38] 119 Wn.2d 538, 834 P.2d 611 (1992)..

[39] *See Perrone*, 119 Wn.2d at 559.

[40] 2 LaFave, *supra* note 21, § 4.6(f), at 582; *see also* § 4.10(d), at 670.

[41] *See Andresen*, 427 U.S. at 480.

and its grant of authority to look for books and records not related to drug dealing was insignificant when compared to its whole. As far as we can tell from the record, the police found each item that they seized while they were looking for methamphetamine, paraphernalia related to meth-amphetamine dealing, and books and records related to methamphetamine dealing. The police actually seized mari-juana, ecstasy, scales, and cash that included the bills with which the informant had paid Maddox less than 24 hours earlier. Although the police also seized "miscellaneous pa-pers" from a bedroom, such papers were not offered or argued at the suppression hearing, were not used by anyone at trial, and are not of record on appeal; at a minimum, then, they seem to have been insignificant under the circumstances. Holding that the severability doctrine applies, we conclude that the warrant's overbreadth did not require suppression of the items admitted at trial.

## II

Maddox claims that even if the warrant was lawful at the time of its issuance on September 18, it was not lawful at the time of its execution on September 28. He reasons that even if the magistrate properly found probable cause on September 18, such cause "dissipated" when, on September 27, Maddox told the informant, and the informant relayed to the police, that Maddox was "out of [m]ethamphetamine" for "a couple days."[42] Under these circumstances, Maddox now argues, the police were obligated to recontact the magistrate before executing the warrant; "report that [Maddox] did not have methamphetamine in residence on September 27"; and have the magistrate redetermine whether probable cause continued to exist.[43] The State responds that the police were entitled to decide whether probable cause continued to exist after Maddox said he was

---

[42] CP at 71; FOF 8.

[43] Br. of Appellant at 16.

"out of [m]ethamphetamine"; that the police did not believe his statement; and thus that probable cause continued to exist at the time of the search on September 28.[44]

The parties agree that Washington does not have a "dissipation" case on point.[45] They cite us, however, to several cases from other jurisdictions. Maddox relies on *Commonwealth v. McCants*,[46] *United States v. Jacobs*,[47] *United States v. Bowling*,[48] and LaFave's treatise on the Fourth Amendment.[49] The State relies on *Wicks v. State*.[50] We turn to those authorities.

In *McCants*,[51] a magistrate issued a search warrant for a vacant apartment. Fifteen days later, the police executed the warrant and found drugs. The defendant moved to suppress, maintaining "that any probable cause for the original issuance of the warrant had dissipated by the time the warrant was executed."[52] The Supreme Court of Pennsylvania agreed, stating as follows:

---

[44] Br. of Resp't at 16-17.

[45] Several Washington courts have implied, usually in dicta, that probable cause can "dissipate" after issuance but before execution. In *State v. Thomas*, 121 Wn.2d 504, 513, 851 P.2d 673 (1993), the Supreme Court said that "delay in execution may render a warrant invalid if probable cause no longer exists at the time the warrant is executed." In *State v. Kern*, 81 Wn. App. 308, 312, 914 P.2d 114, *review denied*, 130 Wn.2d 1003 (1996), Division One said that "a search is constitutionally timely so long as the search begins before the warrant expires and so long as probable cause continues through completion of the search." In *Goble*, 88 Wn. App. at 511, Division Two said that a warrant can be based on "information that would cause a reasonably prudent person to believe that the items to be seized will probably be found in the place to be searched *at the time the search is conducted*." (Emphasis added.) In *State v. Higby*, 26 Wn. App. 457, 459, 613 P.2d 1192 (1980), Division Two said that the facts were "insufficient to establish probable cause to believe marijuana was on the premises *at the time of the search*[.]" (Emphasis added.)

[46] 450 Pa. 245, 299 A.2d 283 (1973).

[47] 986 F.2d 1231 (8th Cir. 1993).

[48] 900 F.2d 926 (6th Cir.), *cert. denied*, 498 U.S. 837 (1990).

[49] 2 WAYNE R. LaFAVE, SEARCH AND SEIZURE (3d ed. 1996), *supra* note 29.

[50] *Wicks v. State*, 552 A.2d 462 (Del. 1988).

[51] 450 Pa. 245.

[52] *McCants*, 450 Pa. at 247.

[T]he facts and circumstances justifying a determination that probable cause exists may quickly change. . . . Therefore, when there is an unreasonable lapse of time after a search warrant has been issued and not yet used for a search, it is mandatory that the police return to the issuing authority for a redetermination of probable cause. If this is not done, it is the police who are making the determination that probable cause still exists, and not a "neutral and detached" magistrate.

The search warrant in this case was invalid because at the time it was used . . . the necessary supporting judgment of the neutral magistrate was too remote in time. We cannot now validate the warrant by determining that probable cause did in fact exist. That independent determination by a neutral authority must be made before a warrant is used, not later. Any unreasonable time lapse between the issuance of a search warrant by an independent and neutral magistrate, and the use of the warrant as authority for a search by a police officer jeopardizes the validity of the warrant.[53]

In *Jacobs*,[54] officers had a drug dog sniff a suspect package. The dog "showed an interest" but failed to signal "a full alert."[55] One of the officers then submitted a warrant application in which he noted the dog's "interest," but not the dog's failure to signal an alert. After the magistrate had issued the warrant, but before it was served, the officers had a second drug dog sniff the same package, and this second dog did not even show "interest." Without advising the magistrate of this new development, the officers searched the package and found drugs. After holding that the officer who wrote the warrant application had violated *Franks v. Delaware*[56] by recklessly omitting key information, and that the officers executing the warrant had not acted in "good faith" within the meaning of *United States v. Leon*,[57] the Eighth Circuit continued:

---

[53] *McCants*, 450 Pa. at 249-50 (emphasis omitted).

[54] 986 F.2d 1231.

[55] *Jacobs*, 986 F.2d at 1233.

[56] 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

[57] 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984).

[E]ven if the violation of *Franks* could be protected under *Leon*, we could not find that the officers acted reasonably when they executed this warrant. At the time the warrant was executed, not only did the officers know that [the first dog] had failed to alert to the package, they were also aware that a second dog ... had not even shown the amount of interest that [the first dog] exhibited. Nevertheless, the officers executed the warrant, ignoring the obvious negative finding obtained during the second sniff. This is indefensible. Not only was the warrant deficient under *Franks*, this further information should have alerted the officers that they lacked probable cause to examine the package. Furthermore, we think the officers had a duty to provide the magistrate judge with any information which would undercut the warrant's validity. The officers could not simply rest on a warrant they had already received when this information came to light. ...[58]

In *Bowling*,[59] a number of officers thought the defendant had drugs in his remote rural home. Some went for a warrant, while others remained outside the home. While the first group was gone, the second group obtained the defendant's consent, cursorily searched the home—and found nothing. When the first group returned with a warrant, it executed the warrant without advising the magistrate that a consent search had already been performed without success. The defendant argued on appeal that the unsuccessful consent search had negated any probable cause that might have existed when the warrant was issued. The government responded that probable cause was needed when the warrant issued, but not when the warrant was executed. In the course of rejecting the government's position, the Sixth Circuit reasoned:

The Supreme Court has emphatically cautioned that in the absence of urgent circumstances officers should not rely on their own discretion, but should instead resort to a neutral magistrate, to determine whether probable cause to conduct a search exists. *See Johnson v. United States*, 333 U.S. 10, 14, 68

---

[58] *Jacobs*, 986 F.2d at 1235.

[59] 900 F.2d 926.

S. Ct. 367, 369, 92 L. Ed. 436 (1948) ("when the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent"). Although *Johnson's* admonition speaks specifically to the situation in which officers conduct a *warrant-less* search, we think it is equally applicable to cases in which officers possess a warrant but are alerted to circumstances which affect the probable cause for its execution. The Fourth Amendment's protection against unreasonable searches and seizures would be an incomplete and highly manipulable safeguard if a neutral magistrate could not play the same impartial role in assessing continuing probable cause that he plays in determining probable cause to issue the warrant in the first place. Because no exigent circumstances are presented by the facts of this case, the officers should have refrained from the second search until a neutral magistrate determined that probable cause continued to exist.[60]

Ultimately however, the court "decline[d] to suppress the second search's fruits because [it] believe[d] that even if a neutral magistrate were apprised of the prior fruitless consent search, probable cause for a second search would still have existed."[61]

In LaFave's treatise on the Fourth Amendment, the author states:

A delay in execution is constitutionally permissible only where "the probable cause recited in the affidavit continues until the time of execution." It is possible, therefore, that an unconstitutional delay may have occurred notwithstanding execution of the warrant within the time set by rule or statute, and, of course, notwithstanding that the jurisdiction has set no fixed time within which warrants must be executed. (Indeed, even without any delay at all, new events known to the police may dissipate the recent probable cause showing to the magistrate.)

. . . .

Assume a situation in which a search warrant to search for narcotics in a particular residence is obtained and executed on

---

[60] *Bowling*, 900 F.2d at 933.

[61] *Bowling*, 900 F.2d at 934.

January 15 on the basis of an affidavit which recites that the affiant observed the narcotics in that place on January 1. Depending upon the circumstances, it may be held that this warrant was improperly issued because the observations fifteen days earlier did not make it probable that the narcotics were present in the described place at the time the warrant was obtained. Assuming the circumstances are such as to justify such a holding, what then if the warrant was obtained on January 1 on the basis of the very timely observations of the affiant on that date, but the warrant is not executed until January 15? Although . . . there is nothing wrong with the affidavit, the fact remains that once again the search was made at a time when probable cause did not exist, and thus . . . the constitutional deficiency is no different than in the prior situation. The sufficiency of the affidavit at the time the warrant was issued is hardly determinative, for the "important question *** is whether *** it can be said that the warrant was based upon an independent finding by a neutral and detached magistrate that probable cause *continued to exist*." . . .

If the period of delay in execution has been such that the information supplied to the magistrate no longer shows probable cause, then the search is being made upon the judgment of the police officer rather than a neutral and detached magistrate, contrary to the requirement of the Fourth Amendment. . . .[62]

In *Wicks*,[63] the police obtained a warrant to search Wicks' home based on probable cause to believe he had a stolen gun there. Before serving the warrant, they had an undercover agent try to buy the gun, but Wicks said he had already sold it. The officers then served the warrant anyway, finding evidence of an unrelated rape. On appeal following Wicks' conviction for that rape, the Delaware Supreme Court said:

Wicks contends that the probable cause which supported the issuance of the search warrant dissipated once he informed the police that he had no guns to sell, thus rendering the warrant stale. Since the search warrant authorized a search for stolen

---

[62] 2 LaFave, *supra* note 29, § 4.7(a), at 585-88.

[63] 552 A.2d 462.

guns and ammunition, there existed no basis to justify its execution. This argument presupposes that the police believed, or should have believed, Wicks' statement that he no longer had any guns to sell.[64]

Concluding that "[t]he police were simply not required to believe this statement[,]"[65] the court ruled that the warrant remained valid at the time of its execution.

■ ■ Read together, these authorities show that the probable cause upon which a warrant is based at issuance can be affected (e.g., "dissipated") by information acquired after issuance but before execution. Here then, two questions remain: (1) When is probable cause affected to such an extent that it must be redetermined? (2) If probable cause must be redetermined, who must do that—a neutral magistrate or the police?

We derive our answer to the first question from *Jacobs* and *Bowling*. According to *Jacobs*, it was necessary to redetermine probable cause because the postissuance information supplied by the second dog would, if believed, have negated probable cause. According to *Bowling*, it was not necessary to redetermine probable cause because the postissuance information obtained from "the fruitless consent search" would not, even if believed, have negated probable cause. Comparing the two cases, we conclude that probable cause must be redetermined only when information acquired after issuance but before execution would, if believed, negate probable cause.

We answer the second question by comparing *McCants*, *Jacobs*, and *Bowling*, and LaFave, on the one hand, with *Wicks* on the other. *McCants*, *Jacobs*, *Bowling*, and LaFave all stand for the general Fourth Amendment principle that a neutral and detached magistrate must decide probable cause when time permits. *Wicks* contravenes that general principle by suggesting that the police may decide probable

---

[64] *Wicks*, 552 A.2d at 463-64.

[65] *Wicks*, 552 A.2d at 464.

cause even in the absence of exigent circumstances.[66] Finding *McCants, Jacobs, Bowling,* and LaFave persuasive, and *Wicks* unpersuasive, we hold that if probable cause must be redetermined, and there are no exigent circumstances, the redetermination must be made by a neutral and detached magistrate.

Applying these propositions here, we reject the State's argument that the police were entitled to decide whether Maddox was being truthful when he said he was out of methamphetamine. If Maddox's statement necessitated a redetermination of probable cause, and there were no exigent circumstances,[67] it was up to the magistrate, not the police, to decide whether Maddox should be believed.

We also reject, however, Maddox's argument that probable cause had to be redetermined. If believed, Maddox's statement showed only that his house did not then contain a saleable quantity of methamphetamine; it did not show that his house did not contain other evidence of methamphetamine dealing (e.g., nonsaleable residue, scales, baggies, customer lists and accounts, the identifiable cash paid by the informant on September 18). Concluding that Maddox's statement would not have negated probable cause even if the police had returned to the magistrate, we hold that they were not required to do that, and that the trial court did not err by denying Maddox's motion to suppress.

Affirmed.

HOUGHTON and BRIDGEWATER, JJ., concur.

Review denied at 150 Wn.2d 1031 (2004).

---

[66] Read according to its facts, *Wicks* might have involved exigent circumstances. If it did, it would be consistent with the general principle described in the test. The *Wicks* court did not address, or even mention, exigent circumstances.

[67] No one claims exigent circumstances in this case, and it is apparent there were none. Maddox made his statement on September 27, and the police did not serve the warrant until 2:45 P.M. on September 28.