# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, ) | No. 72120-8-I |
| Respondent, ) | |
| ) | DIVISION ONE |
| v. ) | |
| ) | |
| WILLIAM PHILLIP, JR., ) | UNPUBLISHED OPINION |
| Appellant. ) | FILED: August 29, 2016 |

SPEARMAN, J. — A search warrant may only issue if the underlying affidavit provides facts and circumstances sufficient to conclude that the defendant is probably involved in criminal activity and that evidence of the criminal activity is likely to be found in the place to be searched. While a magistrate may draw reasonable inferences from facts in the affidavit, mere speculation is not sufficient to give rise to probable cause. In this case, William Phillip challenges the trial court's denial of his motion to suppress, arguing that the warrant authorizing search of his cell phone records was invalid. Because we conclude that the warrant was not supported by probable cause, we reverse and remand. Phillip also challenges the trial court's denial of his motion to suppress evidence

seized pursuant to other warrants and his motion to dismiss based on CrR 8.3(b). These claims are without merit and we reject them.

## FACTS

William Phillip lived in Portland, Oregon. Seth Frankel lived in Auburn, Washington. Frankel's girlfriend, Bonny Johnson, lived part-time with him in Auburn and part-time in Portland where she worked.

Johnson became worried when she was unable to reach Frankel by phone on May 21, 2010. On May 22, Johnson called a neighbor and asked him to check on Frankel. When no one responded to a knock on Frankel's front door, the neighbor looked in a window and saw a body on the floor.

Police responded to the neighbor's 911 call and found Frankel dead of a knife wound to his throat. Frankel had also sustained blunt force injuries to his head and knife wounds to his hand and leg. There was an 18-inch black zip tie on one of Frankel's wrists and another zip tie near him. Other than the area immediately surrounding the body, Frankel's apartment was orderly and valuables appeared untouched. A medical examiner estimated Frankel's time of death as between 8:00 p.m. May 21 and 4:30 a.m. May 22.

Police interviewed Johnson the day they discovered the body. They questioned Johnson about her relationship with Frankel and asked her about ex-boyfriends. Johnson identified Phillip, who went by the name "JR," as someone she had dated. Verbatim Report of Proceedings (VRP) (3/26/14) at 70-71. When asked if she could think of anyone who might want to hurt Frankel, Johnson said

2

"I cannot. You know the close[...], I feel terrible saying this because I still consider him a friend and I, I don't think he's capable of it but JR is the only one that has ever said anything ill of Seth [Frankel] to me. . . ." Clerk's Papers (CP) at 227.

Johnson gave police permission to search her cell phone. Officers found that Johnson had been in frequent contact by phone with Phillip and another man, later identified as James Whipkey. Text messages between Johnson and Phillip appeared flirtatious.

At the request of the Auburn police department, a Portland officer visited Phillip on May 25, 2010. Without telling Phillip that Frankel was dead or stating that he was investigating a murder, the officer asked Phillip if he knew Johnson. Phillip stated that Johnson was a friend. When the detective asked Phillip if he had been to Auburn recently, Phillip responded that he wanted to exercise his right to counsel.

Auburn police interviewed Johnson again on May 26. An officer asked if there was anybody in her life who would want to get Frankel out of the way. Johnson replied "All I can think of is JR ... I can't think of anybody else that would hurt Seth [Frankel] like that." CP at 231. When the officer followed up by asking "You think JR would hurt him?" Johnson stated that Phillip was very upset when she broke up with him. CP at 231-32. Johnson said that it scared her to think Phillip might have something to do with Frankel's murder, but the more she thought about it, the more she could not believe that he would do it.

On May 27, the Auburn police department requested a warrant to obtain records from Phillip's cell phone provider. The affidavit briefly describes the crime scene, states that Johnson was Frankel's girlfriend, and states that Johnson requested a welfare check on Frankel before his body was discovered. The affidavit states that Johnson had a significant relationship with Phillip and described him as someone she had dated. A judge approved the warrant.

On May 28, Auburn detectives visited Phillip in Portland. The officers noticed that Phillip's right hand was bruised and part of it was covered with a blood-stained Band-Aid. Phillip stated that he had injured his hand at work. When asked about Johnson, Phillip indicated that the last time he had seen or talked to Johnson was about a month earlier. He later told officers that he had received a text from Johnson the previous weekend. When an officer asked if he had ever been to Auburn, Phillip said he wanted to speak to an attorney.

Detectives interviewed Phillip again on June 2. Officers noticed that he tried to conceal a 1-2 inch cut on his right hand. The officers asked Phillip to voluntarily provide a DNA sample via buccal swab. Phillip denied consent to the buccal swab and refused to answer questions about the last time he was in Auburn.

On June 9, detectives visited the convention center where Phillip worked. Phillip's supervisor stated that Phillip and other employees commonly used zip ties as part of their job duties. The zip ties used at the convention center matched the ties found in Frankel's apartment. A coworker confirmed that Phillip had

injured his hand at work, but stated that the injury did not break the skin or cause bleeding.

Auburn police received Phillip's cell phone records from AT&T on June 20, 2010. The records included the locations of the cell towers pinged by Phillip's phone. On May 21, the day of Frankel's murder, Phillip's phone accessed cell towers along the I-5 corridor heading north from Portland. Phillip's phone pinged cell towers in Auburn from about 7:00 until 9:00 p.m. The cell tower locations then track Phillip returning to Portland.

On June 22, Auburn police obtained a warrant to search Phillip's apartment and motorcycle. They seized Phillip's mobile phone and a journal. In the journal, Phillip wrote that he was "obsessed" with Johnson and that Frankel was not good enough for her. VRP (4/8/14) at 104, 108-09.

In August 2010, detectives learned that a bloodstain from the murder scene had yielded two different DNA samples. The first sample belonged to Frankel. The second sample was from an unknown male. In November 2010, a judge granted the detectives a warrant to obtain Phillip's DNA via buccal swab. Analysis of the sample determined that Phillip was a possible contributor of the second sample. Only about 1 in 2.2 million individuals could have contributed the sample and Phillip was within that set. Phillip was arrested and charged with first degree murder.

In January 2012, officers obtained a warrant to search the contents of Phillip's mobile phone. Detective Blake reviewed the data from the phone. Blake

discovered that Phillip submitted a request for information through a Portland law firm's website several hours before Frankel's body was discovered. Phillip asked if the firm had attorneys that practiced in Washington and stated that he was seeking representation for an alleged violent crime that occurred in Washington State. An attorney responded to Phillip by email later that morning and told him they did not practice in Washington but they may be able to provide a referral. Phillip specified that the alleged crime took place in King County.

Detective Blake summarized this information in an email to the prosecutor, Wyman Yip. The following week, Yip asked Blake to forward the actual emails. The State did not offer the emails into evidence.

In March 2012, Yip asked Blake to prepare a more thorough warrant affidavit for Phillip's cell phone records. Yip stated that the May 2010 warrant was defensible, but the affidavit could have included many other facts that were known at the time. Police prepared an affidavit that incorporated the May 2010 affidavit and provided further details about the crime scene and Johnson's relationship with Phillip. A judge approved the warrant.

Prior to trial, Phillip moved for dismissal under CrR 8.3. He argued that the government committed misconduct by reading Phillip's email exchange with the Portland law firm and that the misconduct was presumed prejudicial. The trial court found that the State had rebutted the presumption of prejudice and denied Phillip's motion.

Phillip also moved to suppress all evidence obtained during the execution of search warrants. The trial court denied the motion. The court found that the May 2010 warrant for Phillip's phone records was invalid because it was not supported by probable cause. But the court found that the March 2012 warrant for the phone records was supported by probable cause and met the requirements of the independent source doctrine. The trial court determined that the other warrants, evaluated without consideration of any information obtained from the faulty May 2010 warrant, were valid.

The jury found Phillip guilty of first degree murder and he appeals.[1]

### DISCUSSION

We first address Phillip's challenge to the trial court's denial of his CrR 8.3 motion to dismiss. He asserts that the State violated his right to confidential communication with an attorney when it read his email exchange with the Portland law firm.

Eavesdropping on an attorney-client conversation is presumptively prejudicial. State v. Pena Fuentes, 179 Wn.2d 808, 819, 318 P.3d 257 (2014). It is the State's burden to rebut the presumption by showing the absence of prejudice beyond a reasonable doubt. Id. This court reviews the trial court's decision on a CrR 8.3 motion for abuse of discretion. Id. at 820. The trial court abuses its discretion if its decision was manifestly unreasonable or based on untenable grounds. State v. Wilson, 149 Wn.2d 1, 9, 65 P.3d 657 (2003).

---

[1] Phillip's first trial resulted in a hung jury. He was convicted at his second trial.

At the hearing on Phillip's motion to dismiss, the court heard testimony from the lead investigator and the forensic examiner who extracted the information from Phillip's cell phone. The court also considered the detective's follow-up report and the prosecutor's affidavit. The trial court found the State's witnesses credible. It found that the police took no meaningful action and discovered no new evidence as a result of the privileged communication. The court further found that the privileged communication did not affect the prosecution's trial preparation or strategy. The trial court accordingly ruled that the State had rebutted the presumption of prejudice and that it could not find any injury to Phillip's rights to due process, counsel, and a fair trial.

The trial court's decision is based on the correct legal standard and is not manifestly unreasonable. There was no abuse of discretion.

Phillip next argues that the trial court erred in denying his motion to suppress his cell phone records. He asserts that the March 2012 warrant was invalid and the cell phone records were thus unlawfully seized.

A search warrant may only issue if the underlying affidavit shows probable cause. State v. Thein, 138 Wn.2d 133, 140, 977 P.2d 582 (1999) (citing State v. Cole, 128 Wn.2d 262, 286, 906 P.2d 925 (1995)). Probable cause exists where the affidavit includes facts sufficient for a reasonable person to conclude the defendant is probably involved in criminal activity and that evidence of the criminal activity is likely to be found in the place to be searched. Id. In the context of a search warrant, the probable cause inquiry focuses on the connection

between the crime, the items sought, and the likely location of the items. Zurcher v. Stanford Daily, 436 U.S. 547, 555-56, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

An affidavit is evaluated "in the light of common sense." Cole, 128 Wn.2d at 286 (citing State v. Young, 123 Wn.2d 173, 195, 867 P.2d 593 (1994)). A magistrate may draw reasonable inferences from the facts and circumstances included in the affidavit. State v. Nusbaum, 126 Wn. App. 160, 166-67, 107 P.3d 768 (2005) (citing State v. Anderson, 105 Wn. App. 223, 229, 19 P.3d 1094 (2001)). But mere speculations are not sufficient to give rise to probable cause. Id. (citing Thein, 138 Wn.2d at 145-46). Whether the facts in the affidavit support probable cause is a question of law that this court reviews de novo. Id. (citing In re Det. of Petersen v. State, 145 Wn.2d 789, 799-800, 42 P.3d 952 (2002)). Our review is limited to the four corners of the affidavit. State v. Neth, 165 Wn.2d 177, 182, 196 P.3d 658 (2008).

Phillip argues that the trial court erred in concluding that the affidavit underlying the March 2012 warrant established probable cause. He argues that the facts in the affidavit do not sufficiently state a factual basis connecting Phillip's phone records with Frankel's murder. We agree.

The March 2012 affidavit incorporates the May 2010 affidavit and thus includes the earlier affidavit's brief description of the crime scene, identification of Johnson as Frankel's girlfriend, information that Johnson asked the neighbor to check on Frankel, and description of Phillip as a man with whom Johnson had a close relationship. The March 2012 affidavit provides further details about the

crime scene, including the fact that doors were locked and that, except for the area immediately surrounding the body, the apartment appeared untouched. It also includes Johnson's statements that Phillip had served in the military, he was the only person she knew who had ever spoken ill of Frankel, he was the only person she could think of who would want to hurt Frankel, and he was extremely upset when she broke up with him. The affidavit reports Phillip's statement to the Portland police that Johnson was "just a friend" and his invocation of the right to counsel when asked if he had ever been in Auburn. CP at 134.

The affidavit includes copies of text messages between Johnson and Phillip in the week of Frankel's death. The text messages appear flirtatious. In one message, Phillip refers to Frankel as an "unhot old man." CP at 133. In Johnson's reply, she tells Phillip not to speak about Frankel like that. The text messages do not express any intent to harm Frankel.

The facts in the affidavit indicate that Phillip had a close relationship with Johnson and frequently communicated with her by telephone. Johnson said that Phillip was the only person she could think of who had spoken ill of Frankel and who might want to harm Frankel. But the only evidence supporting these assertions was Phillip's text referring to Frankel as an "unhot old man" and Johnson's claim that Phillip was very upset when she broke up with him. These facts at most suggest that Phillip may have been jealous of Frankel's relationship with Johnson. But they do not create a reasonable inference that Phillip was

involved in Frankel's death or that evidence relating to Frankel's death would likely be found in Phillip's cell phone records.

The affidavit also establishes that Phillip did not want to discuss with police whether he had traveled to Auburn.[2] This fact may have indicated to police that further investigation was warranted, but it does not establish a connection sufficient to infer that evidence of the crime would likely be found in Phillip's cell phone records. "Absent a sufficient basis in fact from which to conclude evidence of illegal activity will likely be found at the place to be searched, a reasonable nexus is not established as a matter of law." Thein, 138 Wn.2d at 147. See e.g., (State v. Smith, 93 Wn.2d 329, 352, 610 P.2d 869 (1980); State v. Helmka, 86 Wn.2d 91, 92-93, 542 P.2d 115 (1975); State v. Patterson, 83 Wn.2d 49, 52, 61, 515 P.2d 496 (1973)).

The State argues that the facts in the affidavit give rise to a chain of inferences supporting probable cause. The State argued below that Phillip's relationship with Johnson gave him a motive to harm Frankel, Phillip could have obtained a key to the apartment from Johnson, and Phillip thus may have had access to Frankel. The State further argued that Johnson and Phillip may have

---

[2] Phillip argues that the trial court erred in considering his invocation of the right to counsel when asked if he had been to Auburn. Relying on cases holding that a person's exercise of the right to remain silent may not be used as substantive evidence of guilt, Phillip asserts that it is fundamentally unfair to consider his exercise of the right to counsel in evaluating probable cause. App. Br. at 36-37. We reject this argument. An affidavit of probable cause is not limited to facts that are admissible in evidence. State v. Grenning, 142 Wn. App. 518, 534, 174 P.3d 706 (2008) (citing State v. Withers, 8 Wn. App. 123, 125, 504 P.2d 1151 (1972)). A suspect's conduct in speaking with police, including the suspect's invocation of a constitutional right, is relevant to the common sense determination of probable cause.

been jointly involved in the crime and that if either of them was the killer, evidence of the crime would likely be found in Phillip's phone records.

These are mere speculations. The facts in the affidavit provide no basis for inferring that Johnson and Phillip conspired to harm Frankel and that evidence of this conspiracy would be found in Phillip's phone records. To the contrary, in the text messages, Johnson defends Frankel and instructs Phillip not to speak badly of him. Conclusory statements, speculations, and suspicions do not provide a factual basis that supports probable cause. Thein, 138 Wn.2d at 147.

We conclude that the March 2012 warrant for Phillip's cell phone records was invalid and the trial court erred in denying Phillip's motion to suppress the records. The underlying affidavit did not provide a sufficient factual basis from which to infer that evidence of the crime would likely be found in Phillip's phone records. Because we conclude that the warrant was not supported by probable cause, we do not consider Phillip's further challenges to its validity. We also do not consider Phillip's challenge to the testimony of AT&T's custodian concerning the phone records.

Phillip also argues that the trial court erred in denying his motion to suppress evidence obtained from the June 2010 and November 2010 warrants to search his apartment, vehicle, person, and DNA. He argues that these warrants were invalid because they relied on information unlawfully obtained from Phillip's

cell phone records. Phillip also asserts that the unlawfully obtained information motivated police to seek the June and November 2010 warrants. We disagree.

Evidence seized during an illegal search is generally subject to suppression under the exclusionary rule. State v. Gaines, 154 Wn.2d 711, 716-17, 116 P.3d 993 (2005). Evidence derived from an illegal search may also be subject to suppression under the fruit of the poisonous tree doctrine. Id. at 717. One exception to the exclusionary rule, however, is the independent source doctrine. Id.

Under the independent source doctrine, "evidence obtained pursuant to a warrant is admissible, even though the warrant recites information tainted by an unconstitutional search, provided the warrant contains enough untainted information to establish probable cause." State v. Eserjose, 171 Wn.2d 907, 928, 259 P.3d 172 (2011) (citing Gaines, 154 Wn.2d at 719)). To pronounce such a warrant lawful, a court must also find that police would have sought the warrant even without knowing the tainted information. Id. (citing Gaines, 154 Wn.2d at 721). See Murray v. United States, 487 U.S. 533, 542,108 S. Ct. 2529, 2533, 101 L.Ed.2d 472 (1988).

Both a Washington court and an Oregon court issued warrants on June 22, 2010. The Oregon warrant authorized search of Phillip's apartment and motorcycle. It also authorized seizure of Phillip's cell phone and a limited seizure of Phillip in order to photograph his right hand and any other blunt or sharp force injuries on his person. The Washington warrant authorized search of Phillip's

email account and search of Verizon records for information concerning the cell phone number that Phillip dialed at 8:56 p.m. on the night of the murder. The affidavits supporting the two warrants were identical in all relevant particulars. Applying the independent source doctrine, we first analyze the affidavits with all references to the illegally obtained cell phone records excised to determine if the warrants were supported by probable cause.

Viewed in that light, the affidavits contain the following facts: Frankel suffered multiple violent injuries and died of a knife wound to the neck. There were no signs of forced entry or burglary at Frankel's home. Frankel had a cut on one hand. An 18-inch zip tie was around one of Frankel's wrists and another zip tie was nearby. On May 25, investigators searched Johnson's cell phone with her consent. They learned that Johnson was in frequent contact with Phillip. In addition, they were aware that Phillip appeared jealous of Johnson's relationship with Frankel.

The affidavits further state: On May 28, Auburn detectives visited Phillip and observed that he tried to conceal his right hand, which was covered in part by a bloodstained Band-Aid. Phillip stated that he injured his hand at work. Phillip refused to answer any questions about when he was last in Auburn. On June 2, detectives again visited Phillip. The detectives observed that Phillip had a 1-2 inch cut on his right hand when he opened the door. Phillip covered the cut before talking with the detectives. Phillip again refused to answer any questions about Auburn. On June 9, detectives learned that zip ties consistent with the type

found at the crime scene were available at Phillip's work and commonly used in his job duties. A coworker stated that Phillip had injured his hand at work in May but the accident did not break the skin or cause any bleeding.

We conclude that, when viewed with the tainted information excised, the affidavit taken as a whole established probable cause to believe that Phillip was probably involved with Frankel's murder and that evidence of the crime would be found in Phillip's apartment or motorcycle. The affidavit also established probable cause to seize Phillip's cell phone and to seize his person for evidence that the injury to his right hand was related to the crime.

However, the provision in the Washington warrant issued in June 2010 and authorizing search of Verizon records concerning the phone number that Phillip dialed on the night of the crime was not valid. The phone number was known to police from Phillip's unlawfully obtained phone records. Absent that information, there was no probable cause to search phone records for that number.[3]

We next examine whether the police would have sought the warrant even without knowing the information contained in the unlawfully obtained cell phone records. Eserjose, 171 Wn.2d at 928. Phillip asserts that absent those records the police would not have sought the subsequent warrants. We disagree.

---

[3] We conclude that the remaining provisions of the warrant are valid under the doctrine of severability. State v. Maddox, 116 Wn. App. 796, 807-09, 67 P.3d 1135 (2003)).

15

Police obtained the cell phone records from AT&T on June 20. The facts in the affidavit amply demonstrate that Phillip was a person of interest under active investigation prior to that date.[4] We conclude that based on the information gathered in their investigation prior to June 20, the police had probable cause to believe Phillip was involved in the crime and would have sought the additional warrants even without knowledge of cell phone records. The trial court did not err in admitting the evidence obtained from executing the warrant on Phillip's apartment and vehicle.

Under the same analysis, the November 2010 warrant authorizing search of Phillip's DNA was also valid. The warrant affidavit incorporates the previous warrants and additionally states that the bloodstained towel recovered from the murder scene had yielded a partial DNA sample from an unknown male.[5] Police did not have a known sample of Phillip's DNA to compare with the sample obtained from the crime scene.

We conclude that the trial court did not err in denying Phillip's motion to suppress the evidence seized in executing the warrants for Phillip's apartment, motorcycle, email, cell phone, person, and DNA. But because the trial court erred in denying Phillip's motion to suppress his phone records and the cell phone

---

[4] Phillip places great weight on a detective's statement that, at the time police requested the warrant for Phillip's phone records on May 27, they "didn't really have any suspects." App. Br. at 23-24; Reply Br. at 4. But Phillip does not account for the additional information revealed through investigation after police requested the warrant but before they obtained the phone records.

[5] In considering the November 2010 warrant authorizing search of Phillip's DNA, we excise information obtained from the search of Verizon records for the number that Phillip dialed on the night of the crime.

records related to the number Phillip dialed on the night of the crime, we reverse

and remand for further proceedings. We do not reach Phillip's arguments that the

trial court erred in denying his motion to dismiss for juror misconduct or in

requiring Phillip to appear in restraints at sentencing.[6]

   *Reversed and remanded.*

WE CONCUR:

---

[6] We note, however, that the latter issue arose below before our decision in State v. Walker, 185 Wn. App. 790, 344 P.3d 227 (2015) rev. denied, 183 Wn.2d 1025, 355 P.3d 1154 (2015).