# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 84713-9-I |
| Respondent, | (consolidated with No. 86011-9-I) |
| v. | |
| DARRIUS MONTRELL GALOM, | DIVISION ONE |
| Appellant. | UNPUBLISHED OPINION |
| In the Matter of the Personal Restraint of | |
| DARRIUS MONTRELL GALOM, | |
| Petitioner. | |

BIRK, J. — Darrius Galom appeals his conviction, arguing (1) defense counsel was ineffective in failing to call an expert witness to testify about his posttraumatic stress disorder (PTSD), (2) the trial court erred in denying his motion to suppress evidence from the pen register, trap and trace (PRTT) order and cell phone warrant, (3) the State impermissibly commented on his right to prearrest silence, (4) the trial court erred in admitting evidence of flight to show consciousness of guilt, (5) cumulative error, and (6) the trial court erred in imposing the victim penalty assessment (VPA) fee. We affirm Galom's conviction, and remand to allow the trial court to strike the VPA as a ministerial matter.

I

The State filed an information charging Galom with first degree assault, two counts of second degree assault, and second degree unlawful possession of a firearm[1] stemming from an altercation with Jared Naranjo Miramontes on April 20, 2020.

Naranjo testified that on April 20, 2020, he was dropped off at his friend Trust's[2] house, and the two, along with Trust's cousin, made their way to a park in Burien. Naranjo testified that about five minutes after the group arrived at the park, Trust said he saw someone coming that he knew. Naranjo saw a male, later identified as Galom, with two girls walking towards the group. Naranjo said Trust approached Galom "and I think they were talking . . . [a]nd it looked like they were arguing. . . . So, then I got up and started walking towards my friend. And I just remember getting shot."

Officers obtained two recordings of the incident, one from a surveillance camera at a municipal water district pumphouse that overlooked the park, with video but no audio, and another from a homeowner's surveillance camera which contained audio but did not show the park. The State's theory at trial was that Galom first shot Naranjo, fired a second shot at the fleeing group, and fired the third shot towards Naranjo while he was on the ground.

---

[1] Second degree unlawful possession of a firearm was severed from the assault charges. In a bifurcated phase of trial, the jury convicted Galom of the charge. However, the count was later dismissed because the jury was given insufficient evidence to support every element of the charge.

[2] Naranjo's friend is later identified as Jerry Garcia, also known as "Trust" or "Trusty."

Galom testified that on the day of the incident, he met up with Jennifer Soto and Sara Rueda Garcia to go to Southern Heights Park. Galom was in possession of a gun that day because he had "been in instances where [he] got shot at," and a week prior had "just got shot." Galom testified that after about an hour and a half at the park, he, Soto, and Rueda Garcia decided to leave. While walking to the park entrance, Galom recognized a mutual friend amongst a group of people and walked up to shake his friend's hand. Galom testified another individual in the group stood up from the bench and turned around to greet him, and Galom recognized him as Trusty, an individual who had previously shot at Galom. Galom testified Trusty began "egging [him]" and started clutching a gun in his waistband. Galom testified he started to back up, "trying to plead my case, tell him to chill out," and calm the situation.

The other individuals in the group started coming towards Galom "right after [Trusty] stood up and right after I started backing away." Galom testified that "somebody else got up off the bench. And . . . he's coming directly at me with, uh, what I think is a knife in his hand. But, he's literally coming at me." Galom testified that Naranjo "ended up walking in front of Trusty," and Galom shot him. The pumphouse video showed one of the men in the group approach Galom, and showed Galom draw a gun and fire at the man.

Galom testified that after his first shot, the group turned and ran away, and Galom ran and yelled "to, like, scare these guys; you know what I mean? But then I, like, shoot at the ground. I shot literally at the ground. And then I raised my arm, but I'm still yelling at these guys to literally scare these guys." Galom disputed

3

firing the third shot. He testified that he turned around and "right when I turn around, then that's when they shot." After hearing the third shot, Galom ran away from the park and eventually ended up staying at a hotel.

The next day, Soto messaged Galom that officers came and spoke with her. Galom testified that he told Soto to delete some message because he "didn't trust the cops at this time." Galom testified that after Soto spoke with the police, he thought everything was okay because Soto said the police "already knew everything," and they "weren't even looking for [him] at the time," so he "was just under the impression that everything's okay." Galom testified he decided to leave the area due to safety concerns and flew to Indiana "to lay low and kick it for a while, just to let everything calm down." Galom was eventually arrested in Indiana.

After receiving self-defense instructions for all three counts, the jury acquitted Galom of first degree assault and convicted him of two counts of second degree assault. At Galom's sentencing hearing, Galom presented Dr. Christen Carson, a clinical and forensic psychologist, to testify about his PTSD and other factors in support of an exceptional downward sentence based on failed self-defense. The trial court waived all non mandatory legal financial obligations and imposed the victim penalty assessment (VPA) fee. Galom appealed.

After Galom's appellate counsel filed an opening brief in Galom's appeal, arguing, among other things, that trial counsel was ineffective for not calling an expert witness to testify about Galom's PTSD on the issue of self-defense, Galom filed a personal restraint petition raising the same claim. Galom provided declarations from his trial attorneys in which they testified they retained an expert

4

to testify about Galom's PTSD at sentencing, but did not call such an expert at trial. Defense counsel stated she sought an expert evaluation by a licensed forensic psychologist, Dr. Christmas Covell, "primarily for mitigation," however, after learning that the psychologist "did not have significant experience in juvenile brain development research or science" and "[h]er conclusions didn't appear to sufficiently account for [Galom's] biological age and relative maturity," defense counsel concluded Dr. Covell's report "would not be helpful," and did not seek to retain another expert to evaluate Galom or assist with trial preparation. Our commissioner granted Galom's motion to consolidate his personal restraint petition with his direct appeal.

II

Galom argues defense counsel was ineffective in failing to call its expert witness to testify about Galom's PTSD because this would have aided the jury in assessing whether Galom acted in self-defense. We disagree.

Criminal defendants are guaranteed the right to effective assistance of counsel pursuant to the Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution. To show ineffective assistance of counsel the defendant must demonstrate that: (1) counsel's representation was deficient, meaning it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) the defendant was prejudiced, meaning there is a reasonable probability that the result of the proceeding would have been different but for the challenged conduct. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127

Wn.2d 322, 334-35, 899 P.2d 1251 (1995).  If either prong has not been met, we need not address the other.  State v. Garcia, 57 Wn. App. 927, 932, 791 P.2d 244 (1990).

"To provide constitutionally adequate assistance, 'counsel must, at a minimum, conduct a reasonable investigation enabling [counsel] to make informed decisions about how best to represent [the] client.' " In re Pers. Restraint of Brett, 142 Wn.2d 868, 873, 16 P.3d 601 (2001) (emphasis omitted) (quoting Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994)).  If defense counsel's conduct can be characterized as legitimate trial strategy, it cannot serve as a basis for a claim of ineffective assistance of counsel.  State v. Mak, 105 Wn.2d 692, 731, 718 P.2d 407 (1986), overruled on other grounds by State v. Hill, 123 Wn.2d 641, 870 P.2d 313 (1994).  Similarly, an attorney's " 'strategic choices made after thorough investigation of law and facts relevant to plausible options' " will generally not be considered deficient.  State v. Fedoruk, 184 Wn. App. 866, 880, 339 P.3d 233 (2014) (quoting Strickland, 466 U.S. at 690-91)).

A petitioner may seek relief through a PRP when they believe they are under unlawful restraint.  RAP 16.4(a)-(c).  To obtain collateral relief through a PRP, the petitioner must demonstrate both error and prejudice.  In re Pers. Restraint of Sandoval, 189 Wn.2d 811, 821, 408 P.3d 675 (2018).  If the error was of constitutional magnitude, the petitioner must show actual and substantial prejudice.  Id.  If the petitioner shows ineffective assistance of counsel, they have necessarily met the burden of proving actual and substantial prejudice.  In re Pers. Restraint of Crace, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

Galom does not show that defense counsel's decisions about experts constitute deficient performance. Galom received an expert evaluation by a licensed forensic psychologist, Dr. Covell, before trial. His counsel discussed the psychologist's potential findings with her and learned that "a report detailing her findings and opinions would not be helpful." Defense counsel made a strategic choice not to use Dr. Covell's report at trial because they did not deem it would be helpful. Defense counsel was able to argue self-defense and elicit testimony from Galom about his past traumatic experience to explain his perceptions during the shooting.

Defense counsel attested that as trial approached, Galom discussed his childhood and past experiences of trauma with her and "he let down his guard in a way that he had not done before." Dr. Covell previously mentioned that Galom "was guarded and not very forthcoming when she interviewed him." Galom "let down his guard" in February 2022, with voir dire beginning on February 17, 2022, and the first day of testimony being February 23, 2022. It is unlikely that the trial court would have granted a continuance to obtain a new expert witness. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Where Galom's PTSD was recognized, defense counsel consulted an expert about it, and the expert was unhelpful, defense counsel's decision at the time of trial to try the case without expert testimony on PTSD was not deficient performance. Galom's ineffective

7

assistance of counsel claim fails for this reason and we need not address Galom's arguments about whether the lack of a PTSD expert at trial caused prejudice.

III

Galom argues the trial court erred in denying his motion to suppress evidence from the PRTT order and the cell phone warrant.

At the CrR 3.6 hearing, Galom moved to suppress the results of the PRTT order and cell phone search warrant. Galom argued the State was not "requesting information specifically linked to location," but instead requesting "all stored completed communications for this time period, even though there's no indication provided that Snapchat[3] was used at or around the time of the offense." The State argued the request to seize "stored communications" in the PRTT order were "absolutely related and important in this investigation. They were trying to find [Galom's] location. They didn't know where he was. And they knew that his primary way of communicating was on Snapchat." The State argued the cell phone warrant had probable cause for law enforcement to search for "the motive for the crime" and the warrant was limited "even more specifically by communications for specific people." The trial court ruled the PRTT order and cell phone warrant were sufficiently particular.

A

The warrant clause of the Fourth Amendment and article 1, section 7 of the Washington Constitution require that a search warrant be issued upon a

_____

[3] Snapchat is a cell phone app similar to text messaging except photos and texts sent through Snapchat disappear once they are seen by the recipient and are not preserved.

determination of probable cause based upon "facts and circumstances sufficient to establish a reasonable inference" that criminal activity is occurring or that contraband exists at a certain location. State v. Thein, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). There must be "a nexus between criminal activity and the item to be seized and between that item and the place to be searched." State v. Neth, 165 Wn.2d 177, 183, 196 P.3d 658 (2008). "Search warrants may not be based only on generalizations." State v. Denham, 197 Wn.2d 759, 767, 489 P.3d 1138 (2021). We require that probable cause be "based on more than conclusory predictions. Blanket inferences of this kind substitute generalities for the required showing of reasonably specific 'underlying circumstances' that establish evidence of illegal activity will likely be found in the place to be searched in any particular case." Thein, 138 Wn.2d at 147-48. A trial judge's decision to authorize a search warrant is normally reviewed for abuse of discretion. Neth, 165 Wn.2d at 182. "Although we defer to the magistrate's determination, the trial court's assessment of probable cause is a legal conclusion we review de novo." Id.

A warrant is overbroad if it fails to describe with particularity items for which probable cause exists to search. State v. Maddox, 116 Wn. App. 796, 805, 67 P.3d 1135 (2003), aff'd, 152 Wn.2d 499, 98 P.2d 1199 (2004). A search warrant's description of the place to be searched and property to be seized is sufficiently particular if "it is as specific as the circumstances and the nature of the activity under investigation permits." State v. Perrone, 119 Wn.2d 538, 547, 834 P.2d 611 (1992). While the degree of particularity required depends on the nature of the materials sought and the facts of each case, we evaluate search warrants "in a

common sense, practical manner, rather than in a hypertechnical sense." Id. at 549. We review de novo whether a search warrant contains a sufficiently particularized description of the items to be searched and seized. Id.

Washington courts have recognized that the search of computers or other electronic storage devices gives rise to heightened particularity concerns. State v. Keodara, 191 Wn. App. 305, 314, 364 P.3d 777 (2015). A properly issued warrant "distinguishes those items the State has probable cause to seize from those it does not," particularly for a search of computers or digital storage devices. State v. Askham, 120 Wn. App. 872, 879, 86 P.3d 1224 (2004); Keodara, 191 Wn. App. at 314.

In Askham, we held that the warrant was sufficiently particular because while it purported to seize a broad range of equipment, drives, disks, central processing units, and memory storage devices, it also specified which files and applications were to be searched. 120 Wn. App. at 879-80. It listed files related to the owner's use of specific websites and files relating to manipulations of digital images and authorized the seizure of software related to manipulation of images, the defendant's handwriting, and fingerprints, and postage stamps. Id. The warrant's description left no doubt as to which items were to be seized and was "not a license to rummage for any evidence of any crime." Id. at 880.

McKee involved a warrant authorizing a " 'physical dump' " of the phone's memory. See State v. McKee, 3 Wn. App. 2d 11, 29, 413 P.3d 1049 (2018),

overruled on other grounds, 193 Wn.2d 271, 438 P.3d 528 (2019).[4] During an investigation of sexual exploitation of a minor and dealing in depictions of a minor engaged in sexually explicit conduct, police obtained a warrant authorizing a search for all images, videos, documents, calendars, call logs, and other data. Id. at 16, 29. "The warrant [gave] the police the right to search the contents of the cell phone and seize private information with no temporal or other limitations." Id. at 29. This allowed a search of general categories of data without objective standards to guide the police executing the warrant. Id. We held the warrant lacked the requisite particularity because it "was not carefully tailored to the justification to search and was not limited to data for which there was probable cause." Id. "The search warrant clearly allow[ed] search and seizure data without regard to whether the data [was] connected to the crime."[5] Id.

In State v. Higgins, 136 Wn. App. 87, 94, 147 P.3d 649 (2006), we held a search warrant was overbroad because it "in no way limited the search to illicit items," and it "contained no list of examples to guide the search." Its general reference to domestic violence was not particular because the statute contained

---

[4] In McKee, this court held a search warrant was overbroad, suppressed the evidence the State gathered based on it, and remanded for dismissal of the charges. See McKee, 3 Wn. App. 2d at 29-30. The Supreme Court accepted review, but did not review the warrant, and held only that this court had applied the wrong remedy by ordering dismissal, and instead should have remanded for further proceedings with an order to suppress. McKee, 193 Wn.2d at 279. Thus, the Court of Appeals opinion remains precedential on the analysis of the warrant.

[5] In McKee, we found the unlimited search parameters were a constitutional violation even where a witness had informed police of specific images she had seen on the phone depicting the minor, and the opinion did not suggest that any other evidence was used to support charges besides the specific images to which the witness had directed police. 3 Wn. App. 2d at 16, 19, 29.

six different ways to commit the crime. Id. at 93. A warrant to search for evidence of any such violation would allow for seizure of items for which the State had no probable cause. Id.

We look to three factors set out in Higgins to determine if a warrant suffers from overbreadth: (1) whether probable cause exists to seize all items of a particular type described in the warrant, (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not, and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued. Id. at 91-92. " 'Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based.' " McKee, 3 Wn. App. 2d at 23 (quoting United States v. Towne, 997 F.2d 537, 544 (9th Cir. 1993)). A search warrant is overbroad if it either "fails to describe with particularity items for which probable cause exists," or "describes, particularly or otherwise, items for which probable cause does not exist." Maddox, 116 Wn. App. at 805.

B

1

Galom argues the PRTT order does not establish a nexus between the place to be searched and evidence of illegal activity.

The affidavit describes the investigation from the evening of the shooting and law enforcement's initial contact with eyewitnesses. On April 20, 2020, law

enforcement was dispatched to Southern Heights Park where there were reports of a shooting and discovered Naranjo lying on the ground suffering from a gunshot wound to the lower face. Witnesses stated they heard two or three shots and saw several people running away from the park. A witness, Gabriela Irigoyen Diaz contacted law enforcement and stated her daughter, Soto, was likely involved in the shooting. Unidentified friends of Naranjo spoke with law enforcement and stated they heard Soto was present during the shooting and that the shooter was Galom. The affidavit details a surveillance video taken from a water tower near the park that depicted a male and two females walk toward a group of individuals and after a verbal exchanged, showed the male pull out a pistol and fire at the victim.

The affidavit details an interview with Soto and Rueda Garcia who both admitted being at the park with Galom. Rueda Garcia admitted "she did see Galom draw and fire, and the victim get struck in the chin and fall to the ground." The affidavit stated law enforcement unsuccessfully asked Soto, Rueda Garcia, and Galom's mother for assistance in contacting Galom. The affidavit noted Galom did not use a phone with service, but instead used Snapchat to communicate. Galom's mother told the affiant Galom "primarily used a Snapchat account named "Darrius_Galomm" and has used that account to communicate in the last week but recently stopped communicating with family members using that account. She said the new account he is using to communicate with her is the Snapchat account "D_money2400." The affidavit requested to use a PRTT device to locate Galom and arrest him.

13

These circumstances supported a reasonable inference that Galom was probably involved in criminal activity, the shooting, and that evidence of the crime would be found within his Snapchat location data, including evidence locating him at the shooting and showing his then-current location. The PRTT order was supported by probable cause to search for Galom's location.

Galom further argues the PRTT order lacked particularity because it "authorized police to seize the entire communication content of Galom's Snapchat account." The search warrant authorized law enforcement to search the business records of Snap Inc. and seize "evidence of the above crimes, specifically the evidence described in Finding of Fact number (9)(d) above for April 20, 2020 to the date of compliance with this warrant/order, and continuing for the 10 days this warrant is in effect." Finding of fact 9(d) described the following data authorized to be seized,

> i.      Subscriber or Registration Account Information, including subscriber or registered user name or identity, address, billing/payment information; account initiation date; type of account; custom account features; additional phone numbers; addresses (both physical and electronic) and/or other contact information; additional persons having authority on the account; any additional accounts linked to the subject account; account changes for the target address and any linked accounts; and

> ii.     Device Identifying Information for the device accessing the target address, such as phone number, MAC [media access control] address, IP [internet protocol] address, and other unique hardware and software identifiers; and

> v.      Stored Completed Communications including *stored completed/read content associated with the above listed account, including but not limited to; all pictures and videos, all stored Snaps, Stories, Memories, and chat content and all metadata associated with that content*

vi.     Stored Location Information, including stored and transactional records, such as communication detail data, together with date and time of each communication; including positioning information such as GPS [global positioning system] longitude/latitude, or other information tending to reveal the proximate or precise location of the device associated with the above-identified target address, detail such as IP address, Port, Socket Address, VoIP [voice over internet protocol] address, routing information; the address(es) from which the communication is made, conducted, and terminated; non-content text or email, header, IP address; and other non-content information.

(Emphasis added; boldface omitted.)

A warrant can be overbroad if it describes, particularity or otherwise, items for which probable cause does not exist. Maddox, 116 Wn. App. at 805. The PRTT order authorized police to search for numerous items that were supported by probable cause and described with particularity, such as the subscriber information, device identifying information and stored location information. However, the order could be read to authorize law enforcement to also seize the entirety of Galom's "Stored Completed Communications," without limitation.[6] The affidavit fails to establish a nexus between Galom's "pictures and videos, all stored Snaps, Stories, Memories, and chat content" and evidence of his location or otherwise evidence of the crimes under investigation. Thus, for the same reasons explained in McKee, to this extent the PRTT order was overbroad.

---

[6] The order is ambiguous as to whether it required account content to be believed by law enforcement to constitute "evidence of the above crimes" in order to be seized, or defined the account content as "evidence of the above crimes" subject to seizure. The State does not argue that the prefatory language "evidence of the above crimes" provided the necessary specificity under the Askham/McKee framework and, because we conclude the order is severable, it is not necessary to determine whether the prefatory language was so effective.

"Under the severability doctrine, 'infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant but does not require suppression of anything seized pursuant to valid parts of the warrant.' " Maddox, 116 Wn. App. at 806 (internal quotation marks omitted) (quoting Perrone, 119 Wn.2d at 556). The severability doctrine applies only where: (1) the warrant lawfully authorized entry into the premises, (2) the warrant includes one or more particularly described items for which there is probable cause, (3) the part of the warrant that includes particularly described items supported by probable cause is significant when compared to the warrant as a whole, (4) the searching officers found and seized the disputed items while executing the valid part of the warrant (i.e., while searching for items supported by probable cause and described with particularity), and (5) the officers did not conduct a general search. Id. at 807-08.

The PRTT order meets all five requirements. Of the four categories of data that were requested to be seized, three were particularly described and had probable cause. Law enforcement had probable cause to seize "Subscriber or Registration Account Information," "Device Identifying Information," and "Stored Location Information," to find evidence that the account was connected to Galom, and discover Galom's location. These categories were limited to a time frame of 10 days. The warrant's grant of authority to search for location data was significant when compared to its whole. Law enforcement found each item that they seized while they were looking for Galom's location data. And although law enforcement also seized "two videos that were taken from the Snapchat information" of the day the shooting occurred, this evidence was not offered or used at trial. We conclude

the severability doctrine applies, and the PRTT order's overbreadth does not require suppression of the properly seized location information admitted at trial.

2

Galom argues the cell phone warrant did not establish a nexus between the place to be searched and evidence of illegal activity.

Galom does not question that the cell phone affidavit gave probable cause linking him to the shooting. It described the investigation from the evening of the shooting and law enforcement's initial contact with eyewitnesses. These witnesses included Elizabeth and Valery Resindez, both of whom saw Jerry Garcia and heard him say Galom had shot at him. The affidavit discussed the surveillance video captured from the water tower and the subsequent interviews with Soto and Rueda Garcia. Rueda Garcia "identified one of the members of the victim group as Jerry Garcia and showed detectives a Facebook page with the username of 'Ese Trusty.'" The affiant was "familiar with Garcia from other investigations and [knew] that he associates with the Playboy Surenos criminal street gang." Based on information learned from the previously issued PRTT order, and given the "number of messages and geolocation points," the affiant stated it was reasonable to believe that Galom was in possession of a cell phone from April 20, 2020 onward. In an interview Galom described the incident and stated one of the individuals from the park "had a problem with him," and after seeing three guns, he "drew his own pistol and fired at one of the guys" in self-defense.

Galom focuses his argument on the affiant's basis for believing evidence would be found on his phone. The affiant learned that Galom's younger sister had

been reported as a runaway to Texas law enforcement and "considering the possibility of [Galom] meeting with his sister while fleeing law enforcement," they contacted Texas law enforcement. In the course of the runaway investigation, law enforcement spoke with the sister's father and step-mother and learned that Galom "had recently been communicating with [his sister] via cell phone. They related that [Galom] had told [his sister] that he had 'shot someone in the face,' and described other criminal activities." This information is sufficient to raise a reasonable inference that evidence of the crime would be found in Galom's cell phone records.

Citing State v. Vickers, 148 Wn.2d 91, 112, 59 P.3d 58 (2002), Galom nevertheless argues that we should not consider his sister's parents' statements to Texas law enforcement when determining whether probable cause exists because, Galom says, their statements fail to meet the Aguilar/Spinelli test. Aguilar v. Texas, 278 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969). Galom cites no authority applying the Aguilar/Spinelli test outside the setting of a confidential informant nor any basis to conclude that it applies at all to statements like those here by concerned parents relaying information logically received from their child and circumstantially matching details of the crime under investigation. Assuming without deciding that Aguilar/Spinelli applies in such a context at all, the apparent circumstances of reliability in the parents' report here easily meets the reliability standards of that test. In the confidential informant context, when an officer bases their suspicion on an informant's tip, the State must show that the tip

18

bears some "indicia of reliability" under the totality of the circumstances. State v. Z.U.E., 183 Wn.2d 610, 618, 352 P.3d 796 (2015). This test requires that there either be (1) circumstances establishing the informant's reliability or (2) some corroborative observation, usually by the officers, that shows either (a) the presence of criminal activity or (b) that the informer's information was obtained in a reliable fashion. State v. Sieler, 95 Wn.2d 43, 47, 621 P.2d 1272 (1980); State v. Lesnick, 84 Wn.2d 940, 943-44, 530 P.2d 243 (1975). These corroborative observations do not need to be of particularly blatant criminal activity, but they must corroborate more than just innocuous facts, such as an individual's appearance or clothing. See State v. Wakeley, 29 Wn. App. 238, 241-43, 628 P.2d 835 (1981). Here, Galom's sister's parents told law enforcement that their daughter had been communicating with Galom and during that communication, Galom told her he " 'shot someone in the face.' " The familial chain of communication along with the accuracy of the statement—Galom said he " 'shot someone in the face' " which is exactly what happened on April 20, 2020—are indicia of reliability. The cell phone warrant did not lack probable cause.

Galom additionally contends the cell phone warrant violates the particularity requirement because it did not limit the search to a specific part of Galom's phone, but instead "authorized a search of the entire content of the phone and then permitted the police to rummage through its content to locate certain categories of information."

The warrant satisfies the particularity requirement. It directed officers to "search" the phone and "seize" evidence of the crime and evidence of the identity

of the owner of the device. The seizure of the evidence was limited to communications with Soto, Rueda Garcia, and Galom's sister about the crime, internet searches relating to media coverage of the incident, location information between April 10 and April 20, and photographs or videos depicting the possession of a firearm. Furthermore, the warrant authorized the search of information regarding the telephone number associated with the seized phone, its service provider and all data used by a service provider to identity the phone, and evidence of other accounts associated with the device that would aid in determining the user of the device. The terms of the warrant were sufficiently descriptive to direct law enforcement's actions. Law enforcement had probable cause to seize information specified as likely evidencing the crimes under investigation that would demonstrate the phone being searched was Galom's, and that any evidence discovered on the phone was connected to Galom.

Thus, in contrast to McKee, the warrant did not authorize search of the electronic data repository without identifying the material sought, but rather as in Askham described the specific matter permitted to be sought within the larger data repository. Accord United States v. Purcell, 967 F.3d 159, 181 (2d Cir. 2020) ("The September 2017 Warrant identified the target Facebook account to be searched and the specific kinds of data from that account to be seized. It was therefore adequately particularized and justifiably broad with respect to both the location to be searched (the 'Mike Hill' Facebook account) and the items to be seized from that location (the twenty-four enumerated categories of data)."); United States v. Ulbricht, 858 F.3d 71, 100-01 (2d Cir. 2017) (warrant issued to search a laptop for

specifically identified items relevant to the charged criminal enterprise), overruled on other grounds by Carpenter v. United States, 585 U.S. 296, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018).

The trial court did not err in denying Galom's motion to suppress the cell phone warrant.

IV

Galom argues for the first time on appeal that the State impermissibly commented on his exercise of the right to prearrest silence. We hold that Galom cannot raise this issue for the first time on appeal because he cannot establish a manifest error affecting a constitutional right under RAP 2.5(a)(3).

On cross-examination, the State questioned why Galom traveled to Indiana after the shooting if it "made it harder for law enforcement to find" him. Galom testified he did not believe law enforcement was looking for him. The State questioned, "You just shot someone at a park? And—and you thought that law enforcement wouldn't at least want to talk to you about it?" The State later asked Galom why he did not consider calling 911 after the incident to "clear this up."

Galom did not object in the trial court that the State improperly commented on his prearrest silence. RAP 2.5(a)(3) states that a party may raise for the first time on appeal a "manifest error affecting a constitutional right." This rule is intended to allow a reviewing court to correct any "serious injustice to the accused" and to preserve the fairness and integrity of judicial proceedings. State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). To determine the applicability of RAP 2.5(a)(3), we ask whether (1) the error is truly of a

constitutional magnitude, and (2) the error is manifest, meaning the appellant can show actual prejudice. State v. J.W.M., 1 Wn.3d 58, 90-91, 524 P.3d 596 (2023).

The Washington state and federal constitutions provide criminal defendants with the right against self-incrimination. State v. Easter, 130 Wn.2d 228, 235, 922 P.2d 1285 (1996). Miranda v. Arizona held pursuant to the self-incrimination clause of the Fifth Amendment that "if a person in custody is to be subjected to interrogation," they must first be informed that they have the right to "remain silent." 384 U.S. 436, 467-68, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Miranda warnings "constitute an 'implicit assurance' to the defendant that silence in the face of the State's accusations carries no penalty." Easter, 130 Wn.2d at 236. The State violates a defendant's due process rights under the Fourteenth Amendment if it uses for impeachment purposes a defendant's silence at the time of arrest or after receiving Miranda warnings. Doyle v. Ohio, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). The prohibition against using post-Miranda silence "rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.' " Wainwright v. Greenfield, 474 U.S. 284, 291, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986) (quoting South Dakota v. Neville, 459 U.S. 553, 565, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983)).

However, "the Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility." Jenkins v. Anderson, 447 U.S. 231, 238, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980). In Jenkins, the defendant was charged with murder and later convicted of manslaughter. Id. at 232, 234. He

did not report the incident to the police until about two weeks after the killing. Id. at 234. At trial, Jenkins admitted stabbing the victim but claimed self-defense. Id. at 233. During cross-examination, the prosecutor elicited from Jenkins that he had not reported the stabbing to the police for two weeks, suggesting that he would have spoken out if he had killed in self-defense, and again referred to Jenkins's prearrest silence during closing argument. Id. at 233-34. Jenkins argued the prosecutor's actions violated the Fifth Amendment. Id. at 235. The Court, quoting Harris v. New York, 401 U.S. 222, 225, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971), stated,

> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. . . . Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process.

Jenkins, 447 U.S. at 237-38 (alteration in original) (quotation marks omitted). For "[o]nce a defendant decides to testify, '[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.' " Id. at 238 (alteration in original) (quoting Brown v. United States, 356 U.S. 148, 156, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958)). The Court noted that the decision did not force any state court to allow impeachment with prearrest silence, and jurisdictions remained free to formulate evidentiary rules defining the situation. Id. at 240. But, such a rule would not be based on the federal constitution. Id. at 238.

Galom's case is in conformity with Jenkins, and thus does not raise a constitutional issue. As in Jenkins, Galom was involved in a killing and then for several days made no report to the authorities, only to claim while testifying at trial that the killing was in self-defense and so lawful. Under Jenkins, Galom was properly subject to cross-examination on his failure to make that claim at the time of the killing, and the Fifth Amendment did not shield him from this cross-examination. Because using prearrest silence for impeachment purposes does not violate the Fifth Amendment but, under Jenkins, implicates evidence law at best, Galom fails to show that any error is one of truly constitutional dimension, as required by RAP 2.5(a)(3).[7]

V

Galom argues the trial court wrongly admitted evidence of his travel to Indiana after the shooting to show consciousness of guilt. We disagree.

During discussion of motions in limine, the State moved for leave to "introduce the fact that [Galom] fled the state[ and] went to Indiana" to "make

---

[7] Galom further argues we should engage in a State v. Gunwall analysis to determine whether the Washington Constitution provides greater protection than the Fifth Amendment. 106 Wn.2d 54, 720 P.2d 808 (1986). In State v. Earls, 116 Wn.2d 364, 374-75, 805 P.2d 211 (1991), use of the Gunwall analysis was found to be unnecessary because "the protection of article 1, section 9 is coextensive with, not broader than, the protection of the Fifth Amendment." Though Earls addressed the Fifth Amendment right to counsel rather than Fifth Amendment privilege against self-incrimination, Earls relied upon State v. Moore, 79 Wn.2d 51, 483 P.2d 630 (1971) and State v. Franco, 96 Wn.2d 816, 639 P.2d 1320 (1982), abrogated on other grounds by State v. Sandholm, 184 Wn.2d 726, 364 P.3d 87 (2015), two decisions which specifically addressed the coextensive scope of the state and federal privileges against self-incrimination. See Earls, 116 Wn.2d at 375-77. Because Earls, Moore, and Franco hold that the state constitution does not afford an analysis different from that of the federal constitution, and are binding on this court, we decline to engage in the Gunwall analysis that Galom proposes.

24

argument about the fact that he did leave the State after this shooting happened." Galom argued the State did not have evidence linking flight to consciousness of guilt, and "[t]here [was] no indication from the State, no specific evidence that they can point to that suggests that [Galom] left because he was trying to avoid apprehension rather than for fear of his own safety." Instead, Galom argued, "There is every reasonable inference that [Galom's] leaving of Washington and leaving the scene was out of fear for his own safety." The trial court admitted the evidence and concluded, "[I]t could be evidence of consciousness of guilt and also fear of retaliation. And those things aren't mutually exclusive."

We review a trial court's decision to admit or exclude evidence for abuse of discretion. State v. Jennings, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). A trial court abuses its discretion when the exercise of discretion is unreasonable or based on untenable grounds. State v. Barker, 103 Wn. App. 893, 902, 14 P.3d 863 (2000). "A trial court must not automatically allow [flight evidence] but must first decide whether or not the proposed evidence amounts to a reasonable inference of flight that is more than mere speculation and supports a consciousness of guilt inference." State v. Slater, 197 Wn.2d 660, 674, 486 P.3d 873 (2021). The probative value of flight evidence as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged

to actual guilt of the crime charged. State v. Freeburg, 105 Wn. App. 492, 498, 20 P.3d 984 (2001).

Here, Snapchat GPS coordinates showed Galom in Indiana three days after the shooting. Contrary to the State's suggestion, the bare fact of travel to Indiana does not suggest Galom's guilt for any of the assaults charged. The inference of guilt was logical when that fact was combined with other evidence later brought out at trial—namely that Galom resided locally and went to Indiana only abruptly, without advance plans to do so, and shortly after the shooting. Galom argues the evidence merely shows that he went to Indiana because he was afraid of retaliation from those he had shot at. However, the evidence also supports the inference that Galom traveled to Indiana to evade arrest, as he knew law enforcement was investigating the crime. The trial court did not abuse its discretion in admitting Galom's flight to Indiana as consciousness of guilt.

VI

Galom argues that cumulative error violated his right to a fair trial. We disagree. Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). However, the doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial. Id. Here, because any errors are few and had no effect on the outcome of the trial, we reject Galom's cumulative error argument.

26

VII

Galom argues the trial court erroneously imposed the VPA. The State does not object that remand is appropriate to strike the imposition of the fee. We accept the State's concession and remand to strike the imposition of the VPA.

We affirm Galom's conviction and remand to allow the trial court to strike the VPA as a ministerial matter.

_Birk, J._

WE CONCUR:

_Coburn, J._        _Bruman, J_